238 S.W.2d 858 (1951)
McCORMACK
v.
McCORMACK.
No. 28045.
St. Louis Court of Appeals, Missouri.
April 17, 1951.
*859 Ennis & Saunders, Festus, for appellant.
Dearing & Matthes, Hillsboro, for respondent.
HOUSER, Commissioner.
This is a suit for divorce brought by Bryant L. McCormack in which the wife, Geneva, prevailed in the trial court. Defendant was granted a divorce on her cross-bill, custody of their 2-year old child, and the court awarded defendant $2,000 alimony in gross and $45 per month for child support.
Plaintiff appeals for a reversal of the judgment on the ground that the evidence does not establish that defendant is the innocent party or that plaintiff offered her such indignities as would entitle her to a divorce, contending that plaintiff is the party entitled to the decree as the innocent and injured party; that defendant is not entitled to alimony in gross; that the amount awarded therefor is excessive; that the custody award should be modified to enlarge the time provision allowing plaintiff temporary custody for 4 hours on alternate week-ends (an arrangement which will be initiated on April 21, 1951 under the terms of the decree of the trial court); and that the $45 allowance for child support is excessive.
Appellant, conceding that we should accord due deference to the findings of the trial judge, correctly states that this is a trial anew in which this court should reach its own conclusions, rendering such judgment as the evidence in our opinion warrants, reversing the trial court if we are convinced error was committed. Dallas v. Dallas, Mo.App., 233 S.W.2d 738. We agree further that the prevailing party in divorce proceedings must be the injured party within the meaning of the statute, R.S.1949, §§ 452.010, 452.090, and must be free of conduct which would afford the other party a prima facie case for divorce. Cody v. Cody, Mo.App., 233 S.W.2d 777.
We cannot agree, however, with appellant's conclusion that she damns herself by her own evidence, and fails therein to indict him.
*860 This case presents a typical situation wherein the conclusions and findings of the trial court are entitled to great deference, for there was a strong and striking conflict in the testimony of the contending parties in many instances, and in others a complaint having been made by one party, admitted by the other and an explanation offered, it then became a question which of the parties to believe, and whether the explanation, if true, was exculpatory. In such case the appellate court in resolving the conflicting testimony will defer to the trial court's findings for the reason that the judge experienced the courtroom atmosphere, observed the parties and their witnesses under the tension, stress and stimulation provided by the trial, saw their reactions under the sanction of a solemn oath, and in his key position as impartial observer was best suited to ascertain the truth and to detect falsehood.
Both the petition and the cross-bill assigned general indignities as the basis of the cause of action alleged.
Plaintiff, 49 years of age, a railroad telegrapher for many years, married defendant on January 8, 1947 and together they lived on a farm near Plattin, Missouri, until the final separation on October 21, 1949. A baby boy was born of this union on January 11, 1948. Plaintiff had been previously married and divorced on the application of his first wife. This was defendant's first marital venture.
Plaintiff complained: (1) that on one occasion defendant told him he "should be beat half to death." Defendant admitted, but sought excuse from the effect of, this indignity on the ground that plaintiff had been sullen; that he became sullen and morose three or four months after the marriage; that she was "filled up" with his attitude; that she felt something should be done and that "if his cousin or somebody should hit him over the head it might do him good." (2) that defendant often left home overnight, on week-ends, and on one occasion went to Rockford, Illinois, for two weeks, leaving a note which read "If you can spare a minute of your valuable time you might call Bee to see if she needs anything for the baby. I don't know when I will return, but it will be long enough to get my stuff together and take off again." Defendant denied that she ever left with intent to separate from him except at the time of the final separation; that because of his working hours (5 p. m. until 2 a. m. five or six days each week) she was left alone a great deal of the time and although she spent "the biggest majority of the time" at home, occasionally she would visit relatives in nearby towns, always writing notes for him when she left; that "if it would be any length of time I asked him about it"; that she went to Rockford because she felt he was "glad to get rid of" her; that on that occasion she asked for and obtained his permission to make the trip; that she hoped he would find out how hard it was to get along by himself; that his aunt would reason with him about his conduct; and that he would "come to his senses" during her absence. (3) that while showing her brother Harvey through the house on one occasion defendant remarked "Imagine me cooking on an oil range." Defendant maintained that she was not "casting slurs"; said merely "I never thought I would cook on a coal oil stove." (4) that on a certain occasion he asked his wife to take a ride with him to a nearby town but that she was "mad" and refused to go with him. Defendant denied this. (5) that on a trip to St. Louis to the Sears-Roebuck store she "got mad" on her arrival and would not leave the car. She denied this; said she got out and went in a restaurant where she fed the child while plaintiff walked around the store; claimed it was plaintiff who was sullen on the trip. (6) that defendant objected to living on the farmwanted him to sell the farm, buy a house and move to town. She stated that in view of the manner in which he treated her it would have been "nice" to buy a place in town, but that she never was dissatisfied living on the farm; that she was perfectly satisfied to live there; that she took pride in her home; that she "never hounded him or kept after him to sell it or anything." (7) that she once told him "I hate the ground you walk on." She accounted *861 for this misconduct on the basis of his attitude and treatment of her, claiming that he "drove her" to say it; that she "had to explode sometime." (8) that defendant wanted to see who was named beneficiary in an insurance policy on his life. This defendant frankly admitted, stating that it occurred on one occasion, explaining her idea that marriage was "a 50-50 proposition"; contending that she was entitled to know "the financial condition and pertaining to insurance and so forth and so on." (9) that she asked him to make her a deed to the farm, and that she wanted him to put the car in her name. Admitting that she "probably mentioned" the matter of the deed, defendant implied that it was proper and customary to have the property of husband and wife "in partnership" but denied that she wanted to get anything from him, professing that it was her desire to make a home for him. (10) that she had "an ungovernable temper", and Mrs. Goff, plaintiff's aunt, testified that defendant had a high temper, and engaged in outbursts of temper and stated that she often displayed a sullen disposition. This defendant denied. The husband painted her as "mad" ever since she became pregnant because of the child; that this was her "natural disposition". This she denied stating that she was proud of her child.
On the occasion when the divorce papers were served on defendant she "jumped in my face like she was going to hit me" according to plaintiff. Although she did not deny this, defendant claimed that she was shocked and taken unaware by his action, having the idea that "everything was made up" at that time; that she did not want a divorce at that time, but was still hoping that he would "act like a husband should," thinking of "our home and our child."
Under all of the evidence, more of which will be revealed presently, the trial judge very properly could have accepted these explanations offered by the defendant, thereby absolving her of blame in these matters. Plaintiff's evidence of marital misconduct on the part of defendant which was not specifically denied or sought to be excused indicated that defendant engaged in arguments with him frequently; that she always started the arguments; that in the presence of C. I. McCormack in February, 1949 defendant said that she and her son "would not be living on the farm by next Christmas"; that on one occasion when he asked her why she was going to town she said it was "her business"; and that she falsely and in anger told a neighbor that he had beaten a dog. Mrs. Goff testified that defendant often stated she had a room at her father's home to which she could return at any time. This evidence, even if true, is insufficient to warrant the position taken by appellant on this appeal. True or false, it was rejected by the trial judge, and we are not disposed to interfere with his judgment.
At the trial it developed that plaintiff kept a diary of occurrences between plaintiff and defendant. He testified that he began keeping a record four or five months after marriage in order "to keep in mind the statements she made." He "saw the handwriting on the wall * * *" that "she was trying to take me."
Defendant complained: (1) that plaintiff "would not go places" with her. He answered that he was working six days a week and that his work hours interfered with his ability to accompany her. (2) that he was cold, indifferent, sullen and of a surly disposition both before and after the child was born; that he objected to having children; that after he learned of her pregnancy he told her that "if he had known that was going to happen he never would have gotten married." These things were denied by the plaintiff. (3) that plaintiff refused to "sit down and discuss anything"; that sometimes for days at a time he refused to carry on a lengthy conversation; that he was moody and showed her no love and affection; that sometimes he would say nothing for 24 hours. Plaintiff sought to answer this charge by saying that he "couldn't get a civil answer", that his method was to "let her cool off" and "come to her senses." (4) that plaintiff would not take her into his confidence on money matters. The latter said he discussed his earnings with her. (5) that she was "nosy" *862 about his affairs. Plaintiff himself said that on one occasion, when she asked who was the beneficiary in his insurance policy, he told her that she was "the nosiest girl I had ever dealt with." (6) that he stayed away from the home night after night, for six or eight weeks immediately preceding the final separation. This he denied. (7) that he would not accompany her to church, and he asked for justification on the ground that he worked until 2 or 2:30 o'clock on Sunday mornings; that it took an additional 30 minutes to get home, and that he needed his rest. (8) that he would not take her to visit relatives. He countered with the testimony that the relatives would insult him. In support of this conclusion he gave in evidence that on a certain occasion, in the presence of her relatives, his wife referred to the Democratic Party as "a bunch of damned Democrats" and that "none of her folks said anything." (9) that he would not take her to places of amusement. He defended on the ground that he had taken her on trips to Colorado, Illinois and Nebraska. She and a corroborating witness testified that during the course of a trip to Wyoming he got mad about some trivial incident, turned around and came back home before reaching their destination. Plaintiff himself admitted that he "might have got peeved" on that occasion. In any event, plaintiff could not remember ever having taken his wife to any social event in more than two and one-half years of married life. (10) that she was embarrassed by plaintiff's refusal to accompany her to the church for the baptism of their child. Plaintiff admitted that he did not go and offered the excuse that he did not know when the ceremony was to occur, and opined that the child was "too young" and that there was plenty of time for that. The child was approximately one year old at the time of baptism. (11) that he told her he was sorry he ever married her. He denied this. (12) that upon her return from the Rockford, Illinois trip a divorce suit was filed and the papers served on defendant. There was a reconciliation, according to plaintiff's claim after she promised that she would try to make plaintiff a better wife. Defendant denied the occasion for or the making of such a promise, stating that a short time after the reconciliation plaintiff moved his quarters upstairs, while hers remained downstairs, and "he wouldn't look in on us or anything." (13) that he made disparaging remarks about the child and was impatient with him, according to defendant. Plaintiff denied this, claiming that he "thought a lot of the boy" and wanted "to be with him more of the time." (14) that he gave her the impression she was not wanted around the housethat he wanted her "to get out." She said she made efforts to talk to him in a conciliatory manner, and to try to get along, but that it didn't "help much". When she went to Rockford plaintiff put locks on the door and upon her return she broke open the locks and entered the house. This gave rise to her claim that he locked her out. His version was that she left him, and that he put the lock on the door "to keep people out, including her." (15) that he said unkind words to the boy; that when she objected plaintiff said it was "up to her" what she should do, and that he asked her to make up her mind. It was then that she left the home, coming back three days later for linens, silverware and other personal effects of her own.
It is wholly unnecessary to characterize this evidence. If the wife's account of the facts is true, and the trier of the facts has found it to be true, she was offered numerous indignities of such a character and over such a period of time as to render her condition intolerable, and to constitute a species of mental cruelty. Suffice it to say that the trial court had ample justification in the evidence for the decision rendered on the dual questions of innocence and injury.
Appellant's contentions that respondent is not entitled to any alimony in gross and that the amount awarded is excessive are not substantial. While the making of an award of alimony is not mandatory, it is authorized by statute,[1] "in the *863 interest of social welfare and justice" in cases where it is reasonable to impose liability upon the erring husband, Smith v. Smith, 350 Mo. 104, 164 S.W.2d 921, 923. Its allowance is a matter of sound judicial discretion to be exercised upon a full consideration of the situation of both parties, their financial status, their conduct, the cause of the divorce, their obligations and necessities, the contributions of each of the accumulated property, the ages, health and ability of the parties to earn income in the future, and their accustomed living standards.
In this case there was substantial evidence from which the trial judge could find that the farm in plaintiff's name was worth $11,000 less a $1,500 debt thereon, or a net of $9,500; that he had $250 cash, a 1938 Buick automobile, and had realized $200 from the sale of some livestock. Although the testimony showed that he owed $1,000 on a note, he is steadily employed at a salary of $230 a month after deductions. He claims this source of income is jeoparized by a physical condition known as "writer's cramps" with which he says he is afflicted, and by the development of scientific mechanical devices which will ultimately dispense with hand telegraphy. There is no evidence that defendant contributed any money or property to their accumulations, other than that she was modest in her demands and tried to conserve their resources. There is no evidence that defendant is possessed of any independent means or property. She is employed by a glass company as a laboratory technician receiving a salary of about $140 per month after deductions. There is no evidence of her age, or the condition of her health. Apparently accustomed to modest standards of living, she and her 3-year old child are staying with her parents in whose home she pays $50 per month as board for mother and child. It appears that $15 or $20 of this sum is for the child's keep, the balance of that for defendant.
On these facts we do not believe that it was an abuse of discretion for the trial judge to award this defendant alimony in gross, and in doing so to fix it in the sum of $2,000 out of a net estate of approximately $9,000. It is only in the case of an abuse of discretion that such a decree should be set aside. Carr v. Carr, Mo.Sup., 232 S.W.2d 488; Phillips v. Phillips, Mo.App., 219 S.W.2d 249. Indeed, plaintiff is fortunate in the modesty of the size of the award. While each case stands squarely on its own facts and precedents are of questionable value in determining alimony awards, observe that in Schwer v. Schwer, Mo.App., 50 S.W.2d 684, an alimony award of $2,500 in gross was held inadequate by $2,000 in the year 1932, where the husband had a monthly income of two to three hundred dollars and owned property worth $13,000, and that in Bowzer v. Bowzer, 236 Mo.App. 514, 155 S.W.2d 530, an alimony award of $1,000 in gross was held inadequate where the husband had an income of at least $200 per month and owned property worth $8,000, the court determining that the award should have been not less than $50 per month.
Since the chancellor had the parties before him and was fully able to judge of the sincerity, the solicitude and the ability of the father to promote the welfare of the child and in view of the fact that awards of temporary custody are subject to periodic review by the trial court, we will not interfere with the judgment of the court fixing the period of time which the court allowed the father to visit with the child. The trial judge, in awarding to the mother the full time custody of this very young and tender child until April, 1951, thus preventing its periodic transfer back and forth during these early months of his life, exhibited a wise concern for the welfare of the child, and we are not inclined to intervene now, when the first of the 4-hour visits is to commence. We cannot declare that the welfare of the child requires any different handling of the situation. All such orders are at best experimental. If as the parties gain experience in the administration of this part of the decree it is found unworkable or undesirable, if either of them is aggrieved, or if the welfare of the child is adversely affected, the remedy is by way of motion to modify the decree of the trial court.
*864 The assignment that $45 per month is too much for the support and maintenance of this now 3-year old child, considering the income of the defendant, and her testimony that she considered $15 or $20 per month as the amount being paid for the child, we rule against the appellant. While it is true that this small sum is all that is required by the arrangement to be paid for the support of the child, this is only by the grace and through the love of a grandmother for her own, and there is no evidence that $15 or $20 covers all of the needs. Considering current costs of clothing, medical care, food and other necessities of life, we cannot say that an award of $45 per month for the support and maintenance of a child 3 years of age must be scaled down by an appellate court.
Respondent filed a motion in the trial court for allowance of expenses on appeal including the cost of printing her brief and attorney's fees. Not having been determined by the trial court, the motion is reasserted here. In our view we have no jurisdiction to make an award of alimony pendente lite or suit money during the progress of an appeal from the judgment of the trial court in a divorce case. Our jurisdiction is confined to the hearing of "appeals as provided by law from all inferior courts" in this district, except appeals within the exclusive jurisdiction of the Supreme Court, Constitution of Missouri 1945, Art. V, Section 13, and "general superintending control over all inferior courts and tribunals" in said district, and the issuance and determination of original remedial writs, Constitution of Missouri, 1945, Art. V, Section 4. The application for alimony pendente lite and suit money not having been passed on by the trial court cannot be said to be here for our review under our appellate powers, and certainly is not within the power of this court in the exercise of original jurisdiction. The precise point was determined in State ex rel. Clarkson v. St. Louis Court of Appeals, 88 Mo. 135, wherein it was held that the court of appeals had no jurisdiction in a divorce case pending on appeal in that court to make an order on the husband to pay the wife the costs and attorney's fees incident to the prosecution of her appeal. The court said, loc.cit. 138:
"We have in several instances, when the circuit court had failed to allow the wife temporary alimony to prosecute her appeal, refused to entertain motions asking us to make such allowance, holding that to do so would be exercising power not possessed by us either by virtue of our original or appellate jurisdiction."
Later rulings of the Supreme Court have indicated that the only court which can make the order, whether the case be pending in the circuit or the appellate court, is the circuit court. State ex rel. Dawson v. St. Louis Court of Appeals, 99 Mo. 216, 12 S.W. 661; State ex rel. Kranke v. Calhoun, Mo.Sup., 232 S.W. 1038. See also Glass v. Glass, 226 Mo.App. 78, 39 S.W.2d 816. While it is true that the case of McCoin v. McCoin, Mo.App., 218 S.W. 949, cited by respondent, holds that an appellate court has power to adjudge suit money and attorney's fees to prosecute a wife's appeal in a divorce case, we must follow the controlling decisions of the Supreme Court, which reach the opposite result.
The judgment of the trial court was proper in all respects and should be affirmed. The Commissioner so recommends.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.
The judgment of the trial court is, accordingly, affirmed.
ANDERSON, P. J., and McCULLEN and BENNICK, JJ., concur.
NOTES
[1] R.S.1949, § 452.070.